[See Case No. 13,297 and 31 Fed. 585.]

## Case No. 13,297.

STANTON et al. v. ALABAMA & C. R. CO. et al.

[2 Woods, 523.] [1]

Circuit Court, S. D. Alabama. Dec. Term, 1875.

RAILROAD COMPANIES — PURCHASER OF BONDS — RIGHTS — NOTICE — NUMBERING BONDS.

1. A purchaser of railroad bonds is bound to take notice of what appears upon the face of his bonds, and of the mortgage made to secure them.

2. But if the bonds and mortgage, which put the purchaser on inquiry, lull and satisfy inquiry, he is bound to look no further.

3. A railroad company executed a mortgage to secure a series of numbered bonds, all bearing the same date and payable at the same time, not to exceed sixteen bonds of one thousand dollars each to the mile of its road. Five hundred bonds, in excess of this limit, purporting to be secured by this mortgage, were issued by the company and sold for value to bona fide holders. *Held*, (a) That bonds of this kind are numbered, not for the purpose of giving one number any advantage over another, but simply for convenience in registration and identification. (b) In such a case, the five hundred bonds bearing the higher numbers stand on the same footing as those bearing the lower numbers; and when the mortgaged property is inadequate to pay, all are entitled to share pro rata with the others in its proceeds.

[This was a bill in equity by John C. Stanton and others, trustees, against the Alabama & Chattanooga Railroad Company and others.] Heard upon petition of certain bondholders.

The case was this: The defendant company was a corporation of the state of Alabama, whose existence and franchises had been recognized by legislation in the states of Tennessee, Georgia and Mississippi. The company was authorized to construct and use a railroad running from Chattanooga in the state of Tennessee, across the states of Georgia and Alabama to Meridian in the state of Mississippi. An act of the legislature of Alabama, approved September 22, 1868, required the governor of the state, whenever any railroad company of the state should have finished, equipped and completed twenty continuous miles of railroad, to indorse on the part of the state, the first mortgage bonds of the railroad company to the amount of sixteen thousand dollars per mile, for the portion thus finished and completed, and to indorse the same bonds at the rate of sixteen thousand dollars per mile for each section of five miles subsequently completed and equipped. The act also applied to railroads constructed beyond the limits of the state of Alabama by any railroad company organized under the laws of the state. The act further provided: "Nor shall such bonds be indorsed by the governor until the president and chief engineer of such company, upon oath, show that the conditions of this article have been complied with in all respects."

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

Sections 1417, 1422, Rev. Code Ala. On the 19th day of December, 1868, the above mentioned acts being in force, the Alabama & Chattanooga Railroad Company conveyed to trustees, to secure its first mortgage bonds, its entire railroad, extending from Chattanooga, Tennessee, to Meridian, Mississippi, together with all its other property, equipments and franchises. This mortgage recited, that the bonds to be secured by it were to be issued at the rate of sixteen thousand dollars per mile of said railroad. Bonds of $1,000 each, to the number of 5,220, purporting to be secured by this mortgage, were issued for value and put in circulation by the railroad company, all bearing the same date and payable at the same time. Each one of these bonds recited on its face, that it was one of a series of numbered bonds issued in accordance with and upon the conditions prescribed by the acts of the legislature above cited, and secured by an indorsement of the state of Alabama, and by a first lien upon the entire road and property of the railroad company. Each bond also bore the indorsement of the governor of Alabama, which recited, that the railroad company had complied with the conditions prescribed by law, upon the performance of which the governor was required to make such indorsement. Upon each bond was also indorsed a certificate signed by the trustees named in the mortgage, that the bond was one of the series of first mortgage bonds described in and secured by said mortgage deed. The railroad company having made several defaults in the payment of interest, the trustees of the first mortgage deed filed the bill in this case to foreclose the mortgage and bring the railroad property therein described to sale to pay the principal and interest on the bonds, the principal having become due by the default in the payment of interest. On the 23d of January, 1874, a decree of sale was made by the court, and on the first Monday of May, 1875, the property was sold by the master appointed for that purpose, and bid off and purchased by the trustees of said mortgage deed for the benefit and in behalf of all holders of the first mortgage bonds secured thereby. It appears by evidence on file in the case, and is not disputed, that the railroad of the defendant company, between Chattanooga and Meridian, is only 295 miles long. At the rate of sixteen thousand dollars per mile, the terms of the mortgage only authorized the issue of 4,720 bonds of $1,000 each, and the governor was only authorized to indorse that number. Five hundred bonds more than this number were indorsed by the governor and issued and negotiated by the railroad company. The holders of the bonds which bear numbers higher than 4,720 have applied to the court for leave to file their bonds and become sharers in the title to the property bought by the trustees. This petition is resisted by the holders of bonds numbered from 1 to 1,720 inclusive, and upon this issue thus presented this branch of the case was heard.

Samuel Dixon, of Philadelphia, and Thomas H. Herndon and John Little Smith, for petitioners:

1. The petitioners are bona fide holders of bonds which are negotiable instruments before maturity, and their title cannot be impeached except by affirmative proof of bad faith on their part in the acquisition of them. Goodman v. Harvey, 4 Adol. & E. 870; Swift v. Tyson, 16 Pet. [41 U. S.] 19; Peacock v. Pursell, 14 C. B. (N. S.) 728; Pettee v. Prout, 3 Gray, 502; Woodman v. Churchill, 52 Me. 58; Stotts v. Byers, 17 Iowa, 303; Lyon v. Ewings, 17 Wis. 61; Baker v. Walker, 14 Mees. & W. 465; Belshaw v. Bush, 11 C. B. 191, 200; Housum v. Rogers, 40 Pa. St. 190; Palmer v. Richards, 1 Eng. Law & Eq. 529; Ford v. Beech, 11 Q. B. 873; Bank of New York v. Vanderhorst, 32 N. Y. 553.

2. As against these holders, there is no infirmity in the bonds. The corporation is estopped and therefore liable to pay the bonds and the bonds are entitled to share in the security provided by the trust deed, equally with other bonds secured thereby. In re Athenæum Life Assurance Soc.; Ex parte Eagle Ins. Co., 4 Kay & J. 549, cited in Green's Brice's Ultra Vires, 433; Monument Nat. Bank v. Globe Works, 101 Mass. 57; Akin v. Blanchard, 32 Barb. 527; Royal British Bank v. Turquand, 6 El. & Bl. 327; Knox v. Aspinwall, 21 How. [62 U. S.] 544; Woods v. Lawrence County, 1 Black [66 U. S.] 386; Moran v. Miami Co., 2 Black [67 U. S.] 724; Mercer County v. Hackett, 1 Wall. [68 U. S.] 83; Supervisors v. Schenck, 5 Wall. [72 U. S.] 772; Railroad Co. v. Howard, 7 Wall. [74 U. S.] 413.

P. Hamilton, with whom appeared Thomas W. Snagge, of London, England, and T. A. Hamilton, contra:

1. The evidence before the petitioners when they purchased, to authenticate the bonds, does not tend to establish the right asserted against the bona fide holders of other bonds to participate with them in an inadequate security. It may very well be that the bonds held by petitioners are perfectly irreproachable and beyond attack, and yet the bonds not be secured by the mortgage in this case. Philadelphia & S. R. Co. v. Lewis, 33 Pa. St. 33.

2. The face of the bonds put the holders on inquiry as to the extent of the security which had been provided for their payment and the amount of the debt for which that security was pledged, and the mortgage shows that it was executed to secure bonds to an amount not exceeding sixteen thousand dollars per mile. The length of the road is 295 miles; the debt secured by the mortgage can therefore only be $4,720,000 or 4,720 bonds of $1,000 each. When, therefore, parties present bonds of higher numbers, their bonds show on their face that they are not secured by the mortgage.

[See Case No. 13,296.]

WOODS, Circuit Judge. It is conceded that the petitioners are holders of the high numbered bonds for value and without actual notice of any infirmity attaching to them. These bonds are .commercial paper, and as such are binding upon the railroad company when in the hands of a bona fide holder for value. Commissioners of Knox County v. Aspinwall, 21 How. [62 U. S.] 539; Woods v. Lawrence Co., 1 Black [66 U. S.] 386; Mercer Co. v. Hackett, 1 Wall. [68 U. S.] 95; Gelpcke v. Dubuque. Id. 175; Van Hostrop v. Madison City, Id. 291; Meyer v. Muscatine, Id. 384; Murray v. Lardner, 2 Wall. [69 U. S.] 110. By the same authorities they are equitably binding upon the state by reason of its indorsement. Neither the railroad company nor the state enters into this controversy. The contention is between bondholders; the parties who hold bonds bearing numbers less than 4,721 insisting that their bonds only are secured by the mortgage, and what they style the overissue or high numbered bonds are not secured. The claim of the holders of bonds bearing numbers below 4,721 is based on two grounds: first, because the petitioners holding the high numbered bonds were put on notice of the fact that their bonds were not secured by the mortgage; and second, because by the very terms of the mortgage these bonds are not secured by it; that mortgage declares what bonds it is intended to secure, and these bonds are not among them.

1. Were the holders of the overissue or high numbered bonds put on notice of the fact that the bonds they held were in excess of what the terms of the mortgage deed authorized? The power of the railroad company to issue. bonds was unlimited. It could issue as many as it chose. The bonds are therefore binding upon the railroad company. Were the holders of the bonds put upon sufficient notice of the facts that bonds held by them were not secured by the mortgage? The holders of the bonds were bound to take notice of what was contained in or indorsed upon their bonds; they were bound to take notice of what was contained in their deed of mortgage, and of the laws of the state referred to in the deed of mortgage. Royal British Bank v. Turquand, 6 El. & Bl. 327. Upon a reference to this mortgage deed, the purchaser of bonds would have learned that the mortgage was only intended to secure bonds at the rate of $16,000·per mile. He was, therefore, bound to reasonable diligence to find out whether his bonds were secured by the mortgage deed or not.,

By a perusal of the laws of the state referred to in the mortgage, and also upon the face of the bond, he would have learned that the governor of the state of Alabama was authorized to indorse the bonds of the railroad to the amount of $16,000 per mile of completed railroad; that the oath of the president and chief engineer of the railroad company as to the number of miles of completed railroad was required to be filed with the governor as the

evidence of the fact that so many miles had been completed, and that he was authorized to act on that evidence in making his indorsement. By a reference to the bonds, they would have seen that the governor had indorsed them and recited in his indorsement that he had done so in pursuance of law; they would have seen that the face of the bond recited that it was one of a series of numbered bonds, issued in accordance with the laws of the state above recited, secured by the indorsement of the governor, made in pursuance of the same laws, and was a first lien upon the railroad and other property of the railroad company, and they would have seen that the bonds bore the indorsement of the trustees named in the mortgage deed, to the effect that they were the bonds described in, and secured by the said mortgage. So it would seem that the very bonds and mortgage which put the purchasers upon inquiry lulled and satisfied inquiry. They had the right to presume that the governor had not violated his duty; that before he indorsed the bonds, he had on file the oath of the president and chief engineer of the railroad company, that a sufficient number of miles of railroad had been completed to authorize the indorsement. Besides this, they had the statement of the president and treasurer of the railroad company on the face of the bond, and of the trustees for all the bondholders upon the back of the bond, that the bonds were secured by the mortgage. To require the purchaser to go behind the indorsement of the governor, sustained, as they had the right to presume, by the oath of the president and chief engineer of the railroad company, and the statement of the railroad company itself, made by its president and treasurer, and of the trustees who were appointed to act for all the bondholders, would be to require every purchaser of a bond actually to measure the road for himself to ascertain its length. While, therefore, the mortgage put the purchaser upon inquiry as to the length of the road, the mortgage itself, and the bonds, with their statements and indorsements, answered the inquiry in such a way as to satisfy the most cautious and wary. But suppose the purchaser of bonds had ascertained the length of the road for himself by actual measurement, how would that help him to know whether his bonds were outside or inside the terms of the mortgage? The bonds all bear the same date, and fall due on the same day. Bond number one has, therefore, no advantage over any other bond, and no presumptions are to be indulged in its favor. There is no presumption of law that it was issued first or sold first. On the contrary, the presumption is that all were sold at the same time. Practically, we know that where a large number of bonds are put upon the market, the high numbered bonds are just as likely to be sold ·first as the low numbered bonds. So that if the purchaser should, before purchasing, ascertain for himself ˙ the precise length of the road, he would have no

means of ascertaining whether his bonds were over issue bonds or not. The holders of the five hundred bonds highest in number would have precisely the same ground to say that the first five hundred are over issues as the holders of the first five hundred have to say this of the last five hundred.

I conclude, therefore, that while it is true that the mortgage limits the number of bonds to be secured thereby, and the holder of bonds might be required to take notice of that limitation, there was nothing to put him upon notice that the limit thus fixed had been exceeded; on the contrary, that all the presumptions and all the evidence was that it had not; nor if he had ascertained that the limit had been exceeded, was he bound to conclude from the fact that his bonds bore the higher numbers, that they were the over-issue bonds, rather than others.

2. But it is claimed that the mortgage was executed to secure sixteen bonds of $1,000 each to the mile, and no more, and that no larger number of bonds can be secured by it than its terms authorize; that when the officers of the railroad company had issued sixteen bonds to the mile, they had no power to issue a greater number to be secured by that mortgage, and the overissue is not secured. But the difficulty recurs that there is no way of ascertaining which are the over issue bonds. The law presumes they were all issued at one and the same time, and the purchaser has the right to act on that presumption. The bonds are numbered, not for the purpose of giving one number any advantage over another, but as a matter of convenience in their registration and identification. The case is this: A mortgage is made to trustees to secure a given number of bonds, and as a matter of security to the bondholders, the trustees are required to place their certificate upon the bond to the effect that it is described in and secured by the mortgage. The common trustees of all the bondholders are unfaithful, and certify to a larger number of bonds than were intended to be secured by the mortgage. The result is that all must suffer from the unfaithfulness of the trustees. But no part of the bondholders can say that the loss shall fall exclusively on others. It is a case for the application of the rule that equality is equity. A second mortgage bondholder would have the right to insist that the first mortgage should only secure bonds to the extent of $16,000 per mile. But no first mortgage bondholder has the right to say that he shall be paid in full to the exclusion of others whose bonds purport to be secured by the same mortgage, and whose equities are equal to his.

The views expressed are illustrated by a fact in this case. The length of the railroad constructed is, in fact, only 290 miles; five miles of the line between Chattanooga and Meridian is not the property of this road, but is leased from the Nashville and Chattanooga railroad. So that according to the mortgage, the company should have issued and the governor in-

dorsed only 4,640 bonds; yet it issued 4,720 as for the entire line between Chattanooga and Meridian. There is, therefore, among the 4,720 bonds an over issue of 80 bonds. Now I ask what 80 bonds of the 4,720 are to be excluded from the benefit of the mortgage? There is no rule by which any can be excluded. They must all share pro rata in the proceeds of the mortgage property. As the proceeds of the property sold are not sufficient to pay more than one-fourth of the first mortgage bonds, no second mortgage bondholder is injured by allowing the over issue bonds to share in the proceeds, and no first mortgage bondholder can exclude any other from sharing in the proceeds.

The result is that the prayer of petitioners must be granted.