UNION CATTLE COMPANY & others *vs.* INTERNATIONAL TRUST COMPANY.

Suffolk.   March 29, 1889. — June 20, 1889.

Present: MORTON, C. J., FIELD, DEVENS, W. ALLEN, & HOLMES, JJ.

*Creditors — Foreign Corporation — Negotiable Coupon Bonds — Collateral Security — Insolvency — Receiver — Foreign Court — Injunction.*

A Wyoming cattle company issued unsecured negotiable coupon bonds, payable in ten years from date, and shortly afterward deposited some of the bonds with a trust company here, under an agreement that they should be held as collateral security for promissory notes given by the former to the latter for money lent. Subsequently the cattle company was declared insolvent, in proceedings in the Wyoming courts, and receivers were there appointed to wind it up. Upon default in the payment of the promissory notes, the trust company gave notice of its intention to sell the bonds held as security for the satisfaction of its claim. *Held,* upon a bill in equity brought by the cattle company, the receivers, and other bondholders to enjoin the sale, first, that, so far as the plaintiffs' case rested upon the equity of creditors to share equally in the property of the cattle company which was being distributed by the court of Wyoming, it was for that court to determine what the rights of creditors were, and if the defendant chose to take the consequences of a sale an injunction would not be issued to prevent it; and secondly, that, as between the cattle company and the trust company, there was nothing in the contract of pledge which would prohibit the sale.

BILL IN EQUITY, filed March 31, 1888, to prevent the sale of coupon bonds issued by the Union Cattle Company, a Wyoming corporation, and held by the defendant trust company, which was incorporated in this Commonwealth, as collateral security for a debt due to it from the cattle company. Hearing upon the pleadings and agreed facts, before *W. Allen,* J., who reserved the case for the consideration of the full court, in substance as follows.

The plaintiffs other than the Union Cattle Company were the receivers appointed to wind up its affairs, and other holders of like bonds, who appeared for themselves and for others with like interests. These receivers were appointed by a court of Wyoming Territory, in January, 1888, pending a suit in equity before it to dissolve the corporation and to wind up its affairs; and the corporation was at the same time declared insolvent.

The cattle company was engaged in raising and selling cattle in Wyoming until its business was suspended by its insolvency, and its property, all of which pertained to its business, was situated in that Territory and vicinity. The receivers had taken possession of all such property, and were engaged in converting it into money, and the company had wholly ceased to do business and continued a merely formal and nominal existence. The assets of the company, so far as estimated, were far from sufficient to meet its direct liabilities aside from its bonds, and could not be ascertained with certainty, as the title to much of its property was in litigation, and the rest of it had no fixed market value.

In November, 1886, the cattle company issued coupon bonds to the amount of $1,400,000. Each bond was dated November 1, 1886, and was duly signed by the cattle company and under seal, and contained the following:

" The Union Cattle Company, a corporation duly organized under the laws of the Territory of Wyoming, promises to pay to the International Trust Company, trustee, or bearer, one thousand dollars, on the first day of November, 1896, with interest semiannually, at the rate of seven (7) per cent per annum. . . . This bond is one of a series of fourteen hundred bonds, bearing even date, and of like tenor and amount, and is entitled to the benefits and subject to the conditions of an agreement between said Union Cattle Company and said trustee, bearing date November 1, 1886, whereby it is provided that a sinking fund of not less than fifty thousand dollars nor more than one hundred thousand dollars in each year shall be applied to the purchase or drawing at par of said bonds, and that the whole issue may be drawn at par on November 1, 1891, or any coupon day thereafter."

The agreement referred to, which was of even date with the bonds, was duly executed by the cattle company and the trust

company, and, after stating the purpose of the cattle company to issue the bonds and setting out a copy of one of them, recited that the cattle company was to pay to the trust company, "on or before the first day of November in each year, until all of said bonds shall be fully paid or cancelled, not less than fifty thousand dollars ($50,000), and as much more at any time, not exceeding $100,000 in any one year, as said company shall see fit to pay, to be held and managed by said trustee," for the purchase or drawing of bonds in a manner provided for, which bonds were then to be cancelled and delivered up to the company; that the cattle company reserved "the right to call and pay off, at the office of the trustee, on November 1st, 1891, or on any coupon day thereafter, the entire issue then outstanding at par, and accrued coupon interest, upon giving notice by publication" in a manner stated, interest to cease thereon from the last day of such publication; that the cattle company agreed never to place any mortgage or other lien on its property, unless the bonds were also secured thereby; that, upon any default by the cattle company, the bondholders might enforce their rights and collect the amount of the bonds, but without any expense to the trust company; that the trust company should receive certain compensation for its services, and should not be responsible save for gross negligence; and that the trust company accepted the trust. The bonds were not secured otherwise than as appeared by the trust agreement.

Of the total issue, bonds to the value of $780,000 were sold outright to eleven persons, most of whom were stockholders of the cattle company, and were still held by such persons except in case of the defendant. The bonds then remaining, amounting to $620,000, were delivered by the company as security for debts owed by it to various persons, in whose hands they still remained, all of such debts being overdue and unpaid. The coupons maturing on November 1, 1887, were paid, but none have been paid since that time, and the bonds are not publicly dealt in. Bonds of the par value of $59,000 of those originally sold were taken up by the trust company in 1887 with $50,000 paid in by the cattle company to the sinking fund for that purpose, under the provisions of the trust agreement; a small balance of that sum remained in the hands of the trust company, but would all be

exhausted by the payment of the fees due to the trustee under the trust agreement.

The defendant trust company, in or about November, 1886, bought bonds from the cattle company to the amount of $100,000, and before May 27, 1887, had sold all but twenty-four bonds, which it still continued to own. On or about May 27, 1887, the trust company lent to the cattle company the sum of $60,000, upon receiving its promissory notes for that amount, and also received as collateral security fifty-five of its bonds, for which the trust company signed and gave to the cattle company the following receipt: " May 27th, 1887. Received of Union Cattle Co. fifty-five thousand dollars in Union Cattle Co. 7 % debenture bonds, the same to be held as collateral security for any liability of said Union Cattle Co. to said Trust Co. 55,000 Union Cattle Co. Bonds."

Since that date a portion of the loan had been paid, but the defendant still held, as representing the balance due thereon, two unpaid promissory notes of the cattle company, amounting to $35,000, one for $25,000, dated September 27, 1887, payable four months from date to the order of the trust company, and the other for $10,000, dated November 29, 1887, and also payable to its order six months from date, and still held the fifty-five bonds above mentioned as collateral security. The defendant claimed the right to sell these fifty-five bonds, to satisfy not only the two notes held by it, but also the twenty-four bonds which it owned, and had served upon the receivers a notice of its intention to sell the bonds upon a day named, as the cattle company " has failed to pay the note for $25,000 due Jan. 27–30, 1888," and to apply the net proceeds thereof to the satisfaction of such debts.

*J. B. Warner*, (*H. E. Warner* with him,) for the plaintiffs.

1. Inasmuch as the bonds are only the unsecured obligations of the Union Cattle Company, that company did not, by depositing them with its promissory notes, create a pledge, in the usual sense of that word, nor confer, by implication, the rights of sale which usually accompany the delivery of security. The theory of a pledge is, that property is placed with the creditor to be applied to the payment of the principal debt, if that is not met when due. When the debtor secures his debt

by another contract of his own to pay money, the second contract has no absolute or independent efficacy, so long as the first is not dishonored. It is not a debt until the contingency happens which is to make it one, and until then it is, in effect, only a promise to pay if the principal debt is not paid. When the contingency happens which is to give it validity, it becomes an effectual obligation, but it may be performed by performing the first, and, whatever sum it may seem to represent, it is actually regulated wholly by the primary or principal liability. The two contracts represent but one actual obligation, and are to be construed together. They amount to a penal bond conditioned to pay a less sum than the penalty, the secondary contract representing the penalty. They do not represent independent and cumulative obligations, any more than if a debtor agrees to give security if his debt is not paid, or to buy the security at a stated price. In such cases the creditor has a choice of remedies, but cannot compel the debtor to do more than satisfy the principal debt. It is therefore clear, that so long as the two obligations remain in the same hands they cannot both be enforced against the debtor. Is it now permissible for the creditor, who cannot himself enforce both obligations, to accomplish, more or less completely, the same result, by selling his secondary obligation, crediting only what it may bring, and giving the buyer the power to enforce it for the full amount? From the point of view of the debtor, this is allowing that to be done indirectly which may not be done directly. It compels the debtor to discharge his debt by the payment of a penalty, and a penalty which is uncertain in its operation, since it depends upon the price which may be got for the obligation which is sold. The greater the inability to pay, and the consequent loss of credit, the greater is the total amount which the debtor will be compelled to pay. Of course, if the collateral obligations have security attached to them, or carry any rights or advantages other than the liability of the debtor, these collateral rights may be enforced. *In re Regent's Canal Ironworks Co.* 3 Ch. D. 43. *Third National Bank* v. *Eastern Railroad*, 122 Mass. 240. *Morris Canal & Banking Co.* v. *Fisher*, 1 Stockt. 667. *Morris Canal & Banking Co.* v. *Lewis*, 1 Beas. 323. *Jerome* v. *McCarter*, 94 U. S. 734. *Potter* v. *Thompson*,

10 R. I. 1.  These cases rest upon the reason, that the only way to reach the security which is attached to the pledged obligation is to deal with those obligations themselves as security.  But in the present case the bonds are nothing but the plain unsecured obligations of the debtor.  The fact that they are under seal does not give them any additional value.  They have no independent force which can carry liability, regardless of the way in which they are held.

2.  Whatever may be the situation as between the creditor and his debtor alone, when we come to the equities which exist in favor of creditors we have a case which is not open to doubt upon the authorities.  It seems well settled, both in bankruptcy and insolvency, and under winding up proceedings, in England, that a creditor holding such double obligations cannot prove upon both, nor can he sell the pledged obligations in such a way as to give a purchaser the right of full proof, unless he gives credit for the full face value.  *Third National Bank* v. *Eastern Railroad*, 122 Mass. 240.  *Merchants' National Bank* v. *Eastern Railroad*, 124 Mass. 518.  *Ex parte Farnsworth*, 1 Lowell, 497.  *In re Blakely Ordnance Co.* L. R. 8 Eq. 244.  *In re Oriental Commercial Bank*, L. R. 7 Ch. 99.  *Ex parte Macredie*, L. R. 8 Ch. 535. It will be argued, that to prohibit a sale here is to interfere with the agreement which the parties have made; that the debtor, by depositing the bonds as security, has made a contract of pledge, one of the common law incidents of which is the right to sell the security on default; and that, if this is denied, nothing is left, the transaction has no meaning, and the bonds have no value to the holder.  But when the debtor is thrown into insolvency, and his assets are to be divided equitably among competing creditors, then certainly there are settled principles curtailing rights which the creditor might otherwise enjoy, and these enter as qualifications into every contract.  The principle which the plaintiffs invoke here is like that which prevents the creditor of a copartnership from deriving any benefit from the assets of the individual partners until separate creditors are paid, although outside of insolvency their property may be taken for the debt. Furthermore, it is assuming too much to say that the right of sale is an incident which the law attaches to a transaction such as this.  Our contention is, that the law has never recognized

such a right, nor has it recognized this as a pledge at all in the legal sense, so that the creditor, in relying upon a supposed implied right of sale, has relied upon what never existed.

3. There are in this case special considerations, growing out of the character of the bonds, which should serve to prevent a sale. When a pledge consists of ordinary commercial paper, the preponderance of authority is against permitting it to be sold as an ordinary chattel, since such obligations are not marketable. *Fletcher* v. *Dickinson*, 7 Allen, 23. *Wheeler* v. *Newbould*, 16 N. Y. 392. *Joliet Iron & Steel Co.* v. *Scioto Fire Brick Co.* 82 Ill. 548. Negotiable bonds are usually sold as chattels, and rightly, because they are mortgage bonds and because they have a market value. When, however, the bonds are not mortgage bonds and have no market value, but are simply notes under seal, they seem to fall within the rule applicable to commercial paper, and a sale would be an unfair proceeding.

*M. Morton, Jr.*, (*R. M. Morse, Jr.*, with him,) for the defendant.

FIELD, J. We assume, without consideration, that if the cattle company were a Massachusetts corporation in insolvency, under our laws the trust company would not be permitted to prove its debt without surrendering the bonds which it held as collateral security at the time of the commencement of the proceedings in insolvency, as well as the bonds and notes which represented the actual amount of the indebtedness of the cattle company at that time, and that if the trust company, after the commencement of proceedings in insolvency, sold the bonds held as collateral, the purchasers would be excluded from proving them, and the trust company would be excluded from proving even the remainder of its debt after deducting the proceeds of the bonds sold. See *Third National Bank* v. *Eastern Railroad*, 122 Mass. 240 ; *Merchants' National Bank* v. *Eastern Railroad*, 124 Mass. 518 ; *Ex parte Farnsworth*, 1 Lowell, 497 ; *In re Blakely Ordnance Co.* L. R. 8 Eq. 244 ; *In re Oriental Commercial Bank*, L. R. 7 Ch. 99 ; *Ex parte Macredie*, L. R. 8 Ch. 535 ; *Costelo* v. *Crowell*, 134 Mass. 280.

We infer from the agreed statement of facts, that the proceedings in equity which are pending are within the jurisdiction of the court of Wyoming, and that that court can dissolve the cor-

poration, wind up its business, and distribute its property among its creditors.  We do not know on what principles the distribution of the property under the control of that court is to be made, for we do not judicially know the law of the Territory of Wyoming.  It may or may not be the law of that Territory, as administered by its courts, that the claims shall be made up as of a particular time; that the claimants shall be admitted as creditors only to the extent of the actual indebtedness of the corporation to them at that time; and that, if they then held unsecured obligations of the corporation as collateral security for the payment of its indebtedness, those obligations must be surrendered before they can be admitted as creditors to share in property in the custody of the court.  As the trust company is a corporation established by the laws of Massachusetts, it is plainly beyond the power of the Territory of Wyoming to pass any law that will discharge the obligations held by the trust company; but it can prevent the trust company from sharing in any property of the cattle company which the courts of Wyoming have taken into their custody, except upon the condition that the trust company conform to the general laws which it has established for the distribution of the assets of its insolvent corporations.

So far as the plaintiffs' case rests upon the equity of creditors to share equally in the property of the cattle company, which is being distributed by the court of Wyoming, it is for that court to determine what the rights of creditors are.  It does not appear that the trust company intends to ask to be admitted to share in the property in the custody of the court in Wyoming, and if it does not, it is difficult to see how its rights are affected by the proceedings there.  If it is considered inequitable by the court of Wyoming for the defendant at this time to sell the bonds held as collateral, it does not appear that that court has not the power to protect the property in its custody from any attempts that may hereafter be made to prove for their full amount all the obligations which are now held by the trust company, whether that attempt is made by the trust company, or by it and the persons who purchase the bonds held as collateral if they are sold.  We do not see how the mutual rights of creditors to share in the property under the control of the court in Wyoming can be determined by this court.  If, by the law of Wyoming, the trust

company precludes itself from sharing in that property if it now sells the bonds held as collateral, this is no reason why the company should be prevented from selling the bonds if it chooses to take the consequences.

Whether the cattle company, in its own behalf, can maintain this bill to restrain the defendant from selling the bonds which it holds as collateral security, depends upon the contract between the parties. The receipt given by the trust company shows that these bonds, amounting to $55,000, par value, are "to be held as collateral security for any liability of said Union Cattle Company to said trust company." The defendant holds bonds of the cattle company to the amount of $24,000, which it bought, and two promissory notes of the company for money lent, one for $25,000, dated September 27, 1887, payable in four months from date to the order of the defendant, and one for $10,000, dated November 29, 1887, payable in six months from date to the order of the defendant. On February 28, 1888, the defendant gave to the receivers of the cattle company notice that, as that company had failed to pay the note for $25,000, which was then overdue, it would sell the bonds which it held as collateral at public auction and would apply the net proceeds to the satisfaction of the two notes, and of the bonds which it owns. The bonds it holds as collateral security are of the same tenor as those it owns. They are coupon bonds issued by the cattle company, of $1,000 each, payable to bearer on the first day of November, 1896, with interest payable semiannually upon surrender of the coupons. They are expressly made subject to the conditions of an agreement between the cattle company and the trust company, which is the trustee in the agreement under which the bonds were issued, "whereby it is provided," as expressed in each bond, "that a sinking fund of not less than fifty thousand dollars nor more than one hundred thousand dollars in each year shall be applied to the purchase or drawing at par of said bonds, and that the whole issue may be drawn at par on November 1, 1891, or any coupon day thereafter." We think that these bonds are negotiable by virtue of the Pub. Sts. c. 77, § 4, as well as by custom, notwithstanding the conditions referred to in them, and that on their face they appear to be bonds which were intended to be bought and sold in the market.

In *Third National Bank* v. *Eastern Railroad*, 122 Mass. 240, 243, it is said, citing *Morris Canal & Banking Co.* v. *Fisher*, 1 Stockt. 667, that "great doubt is expressed whether a debtor's own obligation has ever been held to be a pledge which can be sold in the market and applied as such." If the parties agree that the debtor's obligation shall be held as collateral security for the payment of a debt, and may be sold if the debt is not paid when it becomes payable, we see no reason why the agreement should not be carried into effect, so far as the parties to it are concerned. If there has been no express agreement to that effect, yet if such an agreement is implied in the contract which the parties have made, it may, we think, be enforced in the same manner as any other agreement which binds the parties.

It is one of the ordinary incidents of a pledge of property to secure the payment of a debt, that it may be sold at public auction after giving notice to the pledgor of the proposed sale, if the debt for which it is security is not paid when it becomes due. The rule and the exceptions to it are stated in *Merchants' National Bank* v. *Thompson*, 133 Mass. 482, 485. The coupon bonds of corporations for the payment of money, which have a long time to run, and are made payable to bearer that they may be bought and sold in the market, are property of such a nature that, when pledged as security for the payment of promissory notes having a short time to run, the reasonable inference is that the parties intended that they should be sold as pledged property is usually sold if the notes are not paid when they fall due. *Morris Canal & Banking Co.* v. *Lewis*, 1 Beas. 323. See Jones on Pledges, §§ 71, 727.

In the present case the bonds are payable in ten years from November 1, 1886, with a right on the part of the obligor to purchase or redeem a part of the series issued each year, and to redeem the whole series on November 1, 1891, or on any coupon day thereafter. The notes, which represent either the whole or a part of the debt to secure the payment of which the bonds were given, matured, one on January 30, 1888, the other on June 1, 1888. It is not a reasonable construction of the contract of pledge in this case, that the parties intended that the trust company should be compelled to hold the bonds until they matured or were redeemed, if the notes were not paid at maturity. The

fact that the bonds are the obligations of the debtor is one circumstance to be considered; but it does not outweigh the fact that, to secure the benefit of the security at or near the time when the notes mature, it would be necessary to sell the bonds, and that the right to sell bonds of this character when held as security is one of the rights which a pledgee ordinarily has. We think that as between the parties the trust company has the right to sell at public auction the bonds held as collateral security, and to apply the proceeds to the payment of the notes. Whether it can apply the proceeds to the payment of the bonds it owns, need not be considered.          *Bill dismissed.*