UNION LOAN & TRUST CO. *v.* SOUTHERN CALIFORNIA MOTOR ROAD. CO.;

(*Circuit Court, S. D. California.* September 12, 1892.)

1. CORPORATIONS—BONDS—PURCHASE BY DIRECTORS—ESTOPPEL.
    A person purchasing bonds of a corporation from its president and one of its directors inquired of its vice president, secretary, and attorney as to their validity, and was informed by each that the bonds were regularly issued and sold, and were valid. The books of the corporation showed that the bonds were authorized to be sold for $35,000, that such director's name was entered as the purchaser, and that he was credited with that sum. *Held,* that the purchaser from the director was an innocent purchaser, and the corporation was estopped to deny the validity of the bonds, as against him.

2. SAME.
    A corporation which, with the knowledge and consent of all its stockholders, sells certain of its bonds to its directors, for less than par, but for their full actual value, is estopped from questioning the validity of the sale, either as against such directors or their assignees.

3. SAME—NEGOTIABILITY OF BONDS.
    In a bond payable at a fixed date, a provision that the obligor may, at its option, redeem the same before maturity at any date when the semiannual interest is due, does not render the bond so uncertain, as to time or amount, as to deprive it of its negotiable quality, under the provisions of Civil Code Cal. §§ 3087–3089, 3091, 3093.

4. SAME—VALIDITY OF ISSUANCE—CONSTITUTIONAL LAW.
    Const. Cal. art. 12, § 11, providing that the stock and bonded indebtedness of corporations shall not be "increased" without the consent of the person holding the larger amount of the stock, does not apply to the first creation of bonded indebtedness.

5. CHATTEL MORTGAGES—VALIDITY—ROLLING STOCK.
    Under Civil Code Cal. § 2955, a mortgage of railroad rolling stock is a chattel mortgage, and is void as against a subsequent attachment, when not executed and recorded in the manner prescribed, or accompanied by the affidavits of good faith required by section 2957.

In Equity.    Suit by the Union Loan & Trust Company against the Southern California Motor Road Company to foreclose a mortgage.    Decree of foreclosure and sale.

For prior reports, see 49 Fed. Rep. 267, and 51 Fed. Rep. 106.

*Brunson, Wilson & Lamme,* for complainant.

*W. P. Gardiner,* for intervener A. S. Garretson.

*R. E. Houghton* and *C. N. Fox,* for defendant Southern California Motor R. Co.

*W. J. Curtis* and *Chapman & Hendrick,* for First Nat. Bank of San Bernardino.

*Frank F. Oster,* for defendant W. S. Hooper.

*Byron Waters,* for defendant D. S. Dorn.

*Charles D. Houghton,* for Mary A. Franklin.

*Curtis, Oster & Curtis,* for San Bernardino Nat. Bank.

Ross, District Judge.    If the evidence now presented in this case was the same as that before the court at the time of the former decision herein, the conclusion of the court would be the same; for I am satisfied that the decision then rendered, upon the facts as then made to appear, was in all things correct.    After that decision was announced, the court, for good cause shown, opened the case for further proofs.    The pleadings were amended, and the evidence taken *de novo,* upon which

the case has been again argued and submitted. The present record makes manifest the fact that the case was not at first well tried, and that the evidence then taken did not disclose the full and true facts of the case. It is, of course, upon the record as now presented that the court must base its present decision.

The suit is one in equity, brought to foreclose a mortgage executed by the defendant motor road company to the complainant, as trustee, to secure the payment of 300 of its bonds, each for the sum of $1,000, with interest. The case shows that before the organization of the motor company one R. W. Button was the owner of certain franchises and rights of way for, and was engaged in the construction of, a motor road from the city of San Bernardino to the town of Colton, in San Bernardino county. He had the road partly built, and, in connection with it, a street railroad line in the city of San Bernardino. Some or all of the parties to the arrangement next mentioned were desirous of securing an extension of the road to Riverside, with the view, mainly, of increasing the value of lands in which they were interested. Negotiations between them and Button resulted in an agreement by which a corporation should be formed with a capital stock of 10,000 shares, of the par value of $100 each, to acquire the property from Button, and to extend the road to Riverside; Button to receive for his plant 5,000 of the shares, and to sell 3,000 of them at an agreed price to the following named parties, and in the following proportions: To George L. Joy, 500 shares; to R. B. Taylor, 1,000 shares; to Samuel Merrill, 500 shares; and to John A. Merrill, G. W. Kanavel, A. H. Naftzger, and John J. Hewitt, 250 shares each. Accordingly, the defendant motor road company was incorporated under the laws of the state of California, with a capital stock of 10,000 shares, of the par value of $100 each, by Samuel Merrill, R. W. Button, John J. Hewitt, A. H. Naftzger, G. W. Kanavel, George L. Joy, R. B. Taylor, John A. Merrill, H. C. Rolfe, and E. W. Freeman; and to this corporation the Button franchises and plant were sold and conveyed, he receiving in consideration thereof 5,000 shares of the stock of the corporation, 3,000 of which he transferred to Joy, Taylor, Kanavel, Naftzger, Hewitt, and Samuel and John A. Merrill in the proportions above stated; and he conveyed to H. C. Rolfe 100 of his remaining shares, in consideration of legal services, and to E. W. Freeman 50 shares. The board of directors of the corporation then consisted of Samuel Merrill, H. C. Rolfe, John J. Hewitt, G. W. Kanavel, George L. Joy, John A. Merrill, and R. W. Button; Samuel Merrill being president. In February, 1888, Taylor took the place of Joy on the board of directors, and succeeded Merrill as president. In addition to the 5,000 shares of stock thus issued to Button for his property interests, and so distributed, there were 600 shares subscribed, the stock for which was not then issued, but upon which there was paid $30,000. The road was but a skeleton, and was but partly built. To build, extend, and equip it required money, and how to obtain the money was the question. The evidence shows that all of the stock then subscribed or issued was held by Taylor, Button, Hewitt, Kanavel, Rolfe, Free-

man, Joy, Naftzger, and Samuel and John A. Merrill. In this condition of affairs a meeting of the board of directors of the corporation was held on the 18th day of January, 1888, at which was presented the written consent and request of the holders of more than two thirds of the stock of the corporation "that the board of directors of said corporation borrow $300,000, in such manner as may seem to them best, giving such first mortgage security bonds or other security or evidences of debt as they may deem proper." The stockholders signing this consent and request were R. B. Taylor, H. C. Rolfe, Samuel Merrill, John A. Merrill, R. W. Button, and E. W. Freeman. Accordingly, the board at the same session adopted what is designated in its minutes as "Order No. 36," and which is as follows:

"Whereas, it is desirous for this company to secure a loan of $300,000 for the purpose of extending and more fully equipping its present road, be it ordered that the board of directors hereby authorize its president and secretary to secure a loan for the benefit of this company of the sum of $300,000, in the following manner: To issue in due form 300 bonds, with interest coupons, which shall be of the denomination of $1,000 each, numbered, respectively, from number one to number three hundred, inclusive. Such bonds and coupons shall be substantially in the following form: [Setting forth' the form of the bonds and coupons.] And it is further ordered that said bonds are to be secured by a first mortgage or deed of trust on the property of the said company, substantially as enumerated in the above bonds, with the usual covenants and agreements to fully secure the payment of said bonds, and to be executed under the corporate seal of this company; and the president and secretary are hereby authorized to sign such first mortgage or deed of trust to the Union Loan & Trust Company of Sioux City, in the state of Iowa, as trustee for the holders and owners of the bonds secured thereby. * * *"

All of the directors of the corporation, then consisting of Samuel Merrill, J. J. Hewitt, John A. Merrill, G. W. Kanavel, R. B. Taylor, R. W. Button, and H. C. Rolfe, were present and voted for this order. The next day, to wit, January 19, 1888, the board of directors again met, at which five of the seven directors were present, namely, R. B. Taylor, R. W. Button, John A. Merrill, H. C. Rolfe, and Samuel Merrill; and at this meeting there was adopted, unanimously, what is designated as "Order No. 39," which is as follows:

"Be it ordered that this company place one thousand shares of the capital stock, and one hundred of its bonds of the denomination of one thousand dollars each, numbered from one to one hundred, both inclusive, in the hands of George L. Joy, who is hereby appointed trustee of this company for the selling of said stock and bonds, and he is hereby authorized to sell all or so much thereof as may be necessary to procure one hundred thousand dollars in cash; and the president and secretary are hereby authorized to issue such stock and bonds, and deliver the same to George L. Joy as such trustee."

While the end sought, namely, the securing of money for the use of the corporation, was the same, it will be observed that here was a departure on the part of the board of directors from the method proposed in the written consent to the issuance of bonds, and from that declared in the previous order of the board directing their issue. But the stock-

holders remained the same, to wit, the ten already named, five of whom voted as directors for the resolution to sell. Four others, Freeman, Joy, Naltzger, and Kanavel, testify that they knew of and approved of it, and the remaining stockholder, Hewitt, bought bonds under the resolution. The evidence clearly shows that the needed money could not be borrowed upon the bonds secured by mortgage or trust deed on the company's property; that neither the bonds nor stock, nor both together, were salable in the market upon the terms proposed, nor upon any terms; and that, if the road was to be built, extended, and equipped at all, it was to be done by money furnished in some way by those directly interested in it. Joy sought to sell the bonds and stock directed to be sold by the resolution of January 19, 1888, but it was not easy to be done. None of the stockholders wanted to buy, and it was impossible to sell to any outsider. Finally, Taylor agreed to take 30 of the bonds and 300 shares of the stock, and to pay therefor $30,000; Samuel Merrill to take 25 of the bonds and 250 shares of the stock, and to pay therefor $25,-000; John J. Hewitt to take 9 of the bonds and 90 shares of the stock, and to pay therefor $9,000; and S. H. Ferris to take 3 of the bonds and 30 shares of the stock, and to pay therefor $3,000. The bonds had not then been printed, and, because of a subsequent mistake in the lithographing of them, there was a good deal of delay in their execution. In the mean time, to enable the company to construct its road, Taylor advanced money to pay for the iron and other material, upon the understanding and agreement that it was to be credited on his purchase of the 30 bonds and 300 shares of stock. He so paid $28,659.15, and the balance of the $30,000 to the company direct, less a small sum allowed him for expenses incurred in attending to the company's business. There can be no doubt of the truth of this, for the testimony of the witnesses is corroborated by the introduction in evidence of the original checks, books, accounts, etc. The testimony as now presented clearly shows, also, that, for the 25 bonds and 250 shares of stock sold by Joy to Samuel Merrill, the latter paid $25,000 in cash; for the 9 bonds and 90 shares of stock sold by Joy to Hewitt, the latter paid $9,000 in cash; and for the 3 bonds and 30 shares of stock sold by Joy to Ferris, the latter paid $3,000 in cash,—all of which the defendant corporation received and appropriated to its own use.

Upon the former hearing of this case the facts in respect to these 67 bonds and 670 shares of stock did not so appear. On the contrary, it then appeared that those bonds and shares of stock were sold and delivered to Taylor, Merrill, Hewitt, and Ferris in consideration, in large part, of pre-existing indebtedness of the defendant corporation to those parties, contrary to the resolution directing the sale, and contrary to the provisions of the constitution of the state in respect to the issuance of such bonds. It furthermore then appeared that the purchase by Taylor, Merrill, Hewitt, and Ferris was in accordance with a secret understanding with Joy, which was magnified by the circumstance, referred to in the opinion of the court then delivered, that after they acquired them, the board of directors of which Taylor was then president, at a

meeting at which he was present, passed an order, for which he voted, to cancel 150 of the original issue of 300 bonds; thus apparently increasing the value of the bonds held by himself and the other directors. In that connection the court there said, and properly said, that, while directors are not debarred by reason of their position of trust from purchasing the bonds of the corporation, their dealings are subject to the careful scrutiny of a court of equity, which will not permit them to stand, unless entirely fair and honest.

It now appears, however, that there was no secrecy about the sale by Joy to Taylor, Merrill, Hewitt, or Ferris, but, on the contrary, that each of those parties purchased the bonds and stock with reluctance, and only because no one else would buy them. It further appears that when Taylor, Merrill, Hewitt, and Ferris agreed to buy, and did buy, the 67 bonds and 670 shares of stock, it was understood that the corporation, through its officers, would endeavor to find some one to buy or loan money upon them, and that, in that event, Taylor, Merrill, Hewitt, and Ferris would surrender the bonds and stock so bought by them, upon the refunding of the money paid by them therefor, with interest. It is impossible to read the testimony given upon the present hearing, and consider it in connection with the original papers, books, etc., introduced in evidence, without being convinced, not only that there was no fraud in the sale by Joy of the 67 bonds and 670 shares of stock to Taylor, Merrill, Hewitt, and Ferris, but that those parties bought the bonds and stock reluctantly, and only because no one else would. And, in respect to the cancellation of 150 of the 300 bonds, it appears that, subsequent to the sale of the 67 bonds and 670 shares of stock by Joy to Taylor, Merrill, Hewitt, and Ferris, and pursuant to the understanding had at the time that, if the company could find some one to purchase or loan money upon them, those purchasers would surrender the bonds and stock upon the refunding of the money paid by them therefor, with interest, Button and Taylor opened negotiations with a Mr. Alberger, of San Francisco, who represented that he could either sell 150 of the bonds, or procure a loan of $100,000 thereon; and, at Alberger's suggestion, the board of directors of the defendant corporation, at a meeting held August 13, 1888, adopted and authorized the following letters prepared by him:

"*W. C. Alberger, Esq.*, 328 *Montgomery St., San Francisco, Calif.:* You are authorized on the part of this company to sell $150,000 of its first mortgage gold bonds, at the rate of 90 % of their par value, with accrued interest. The total amount of bonds authorized to be issued is $300,000; but we will cancel and destroy the remainder ($150,000) of said issue, leaving only $150,000 in existence. Should any different form of bond be required to meet the demands of the market, we will promptly cause the same to be executed upon the general plan and provision of the present mortgage. The said bonds are to be sold by January 1, 1889.

"*Dated this 9th day of August,* 1888.

[Signed]                                      "R. B. TAYLOR, President."

"*W. C. Alberger, Esq.*, 328 *Montgomery St., San Francisco, Calif.:* You are authorized to negotiate for this company a loan of $100,000, for one year

from date, with the privilege of paying the same sooner, if desired, for which we will give the company's note, with $150,000 of the first mortgage bonds of this company as collateral security thereto.    The rate of interest shall not exceed 7 % per annum, and the company shall have the privilege of paying the same after six months from the date of said loan.    The present mortgage provides for the issue of $300,000 of such bonds, but we will cancel and destroy the remaining $150,000 in existence.

    "*Dated August 9th*, 1888.

    [Signed]                                 "R. B. TAYLOR, President."

    The draft of these letters was prepared, as has been said, by Alberger himself, who declined to undertake to effect either the contemplated sale or loan, unless 150 of the bonds were canceled.    Accordingly, at the same session, the board of directors passed an order for the cancellation of 150 of the bonds, numbered from 151 to 300, both inclusive, none of which had been issued, and they were accordingly canceled.    And in anticipation of such sale or loan, and in pursuance of the understanding under which Taylor, Merrill, Hewitt, and Ferris purchased the 67 bonds and 670 shares of stock from Joy, the board of directors, at the same session, adopted what is designated " Order No. 65," which is as as follows:

    "Be it ordered that the secretary issue orders on the treasurer as follows, to wit:

| | |
|---|---:|
| Samuel Merrill | $25,000 |
| R. B. Taylor | 30,000 |
| J. J. Hewitt | 9,000 |
| S. H. Ferris | 3,000 |

—Together with separate orders, hereafter to be issued for the accrued interest, at a rate hereafter to be agreed upon said respective amounts."

    The cancellation of the 150 bonds and the foregoing order No. 65 were suspicious circumstances, when considered in connection with the facts as made to appear on the former hearing, but, in view of the facts now shown, they are not evidence of any fraud on the part of the directors, however irregular the passage of order No. 65 may have been.    Nothing came of the Alberger matter, and none of the orders on the treasurer mentioned in order No. 65 were drawn.    The 67 bonds and 670 shares of stock remained in the hands of Taylor, Merrill, Hewitt, and Ferris, or their assignees.    Twenty-eight of the bonds still remain in the hands of Merrill and Ferris; that is to say, 25 in the hands of Samuel Merrill, and 3 in the hands of Ferris.    The 30 purchased by Taylor were assigned by him to the intervener, Garretson, as collateral security for $25,000, loaned by him to Taylor, and have been since held by Garretson; and the 9 purchased by Hewitt were sold by him, for value, to H. J. Rudisill, who thereafter assigned them as collateral security for a loan of $4,500, made to him by the Farmers' & Merchants' Bank of Los Angeles, which subsequently assigned them to H. W. Hellman, who now holds them.

    The mere fact that the 67 bonds and 670 shares of stock sold to Taylor, Merrill, Hewitt, and Ferris were sold for less than their face value does not render the sale invalid.    *Fogg* v. *Blair*, 139 U. S. 118, 11 Sup.

Ct. Rep. 476. The evidence in the case leaves no room to doubt that those bonds and shares of stock sold for all they were worth, and that no one but the directors named would buy them at all. As the directors thus paid full value for them, and the money was received by the corporation and appropriated to its own use, and all this, as the record shows, with the actual knowledge and approval of all of the then stockholders, the same principles that cause a court of equity to scrutinize with care all dealings of the directors with the trust property, to the end that none be permitted to stand that are not perfectly fair and honest, estops the corporation and its stockholders from questioning such a sale. Holding, as I do, in view of the present record, that the 67 bonds were valid in the hands of Taylor, Merrill, Hewitt, and Ferris, it follows that such of them as were subsequently assigned to Garretson and Hellman are also valid in their hands, without reference to whether they could otherwise be regarded as *bona fide* holders for value; for the law is that they can avail themselves of the position of the previous holders for value, without the necessity of showing themselves to be innocent holders for value. Montclair v. Ramsdell, 107 U. S. 147, 2 Sup. Ct. Rep. 391.

Joy, being unable to sell any more of the bonds and stock, returned the remaining 33 bonds and 330 shares of stock to the defendant corporation. It appeared upon the former hearing of the case that 33 of the bonds were subsequently pledged by the president of the defendant corporation to the San Bernardino National Bank, as collateral security for a pre-existing indebtedness of the corporation of $13,000. And the court held such a pledge to be in violation of that provision of the constitution of the state of California which declares that "no corporation shall issue stock or bonds except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void." Section 11, art. 12, Const. Cal.

But the present record shows the fact to be otherwise, and as follows: On or about January 3, 1889, the president and secretary of the defendant corporation, pursuant to a resolution of its board of directors theretofore passed, authorizing the president to borrow for the benefit of the corporation moneys not exceeding in all $100,000, and to pledge as collateral security for the repayment of such loans, with interest, the bonds of the corporation, applied on its behalf to the San Bernardino National Bank for a loan of $15,000, agreeing to pledge 33 of the bonds of the corporation as collateral security for its repayment, with interest. The bank consented to make the loan upon that security, and placed the money to the credit of the corporation, with which it already had an account, and which money the corporation drew and appropriated. As the 33 bonds were in Iowa at the time of the loan, the president and secretary executed a written agreement that they would deliver them to the bank within 30 days, which was done. The loan was actually made on the strength of the security of the 33 bonds, and a court of equity should so regard it. In view of these facts, in no just sense can they be regarded as having been pledged as collateral security for a pre-existing indebtedness. The evidence now before the court, therefore, removes

the ground upon which, by the former decision herein, those 33 bonds were held to be invalid; and they must now be held to be valid obligations to the extent of satisfying the unpaid balance of the note executed for the $15,000 loan. In respect to the remaining 50 of the 150 bonds, the case shows that, on the 5th of October, 1888, the board of directors of the motor company adopted "Order No. 72," which reads as follows:

"Be it ordered, and it is hereby ordered, that R. B. Taylor, the president of this board, sell 50 bonds of this company now issued, from 68 to 117, both inclusive, for the sum of $35,000."

Taylor took the 50 bonds mentioned in this order, and went to Sioux City, Iowa, to sell them. The facts in relation to that matter, as made to appear upon the former hearing of the case, were thus stated in the opinion of the court then delivered:

"He there sold them to S. A. Garretson for $35,000, which money Taylor received from Garretson, and turned over to the motor company. Before Garretson would buy the bonds, however, he required of Taylor his note for the same amount 'as a guaranty that the bonds were all right;' and Taylor further agreed that, if he could, he would subsequently take the bonds himself. He did so, and, in lieu of the bonds which he received from Garretson, gave as security for his $35,000 note to Garretson certain collaterals of his own."

The present record shows that the real facts in respect to that negotiation between Taylor and Garretson were not as then made to appear. Garretson did agree to buy the 50 bonds from Taylor, and to pay therefor $35,000, and Taylor supposed he would do so; but before the sale was consummated Garretson backed out, not thinking the bonds a good investment. Taylor afterwards concluded to take them himself at the price fixed in the resolution of the board of directors authorizing him to sell them, to wit, $35,000. This sum he paid to the defendant corporation therefor less $16,000, which he had shortly theretofore advanced to it, and which was allowed him as a credit on the purchase.

Whether or not the fact that a part of the money that made up the consideration of $35,000 for the 50 bonds had been advanced to and received by the corporation before the sale of them to Taylor would affect their validity in his hands need not be determined. The records of the corporation showed that the 50 bonds had been sold to Taylor for $35,-000, and that he had paid that sum therefor; and, as a matter of fact, the corporation had received that amount of money from him, and appropriated it to its own use, although, as has been said, $16,000 of the amount had been so received shortly prior to the sale. But the question here is as to the validity of those bonds in the hands of Toberman, who acquired them from Taylor, and who is their present holder.

The case shows that Toberman, who was an entire stranger to all of the foregoing transactions, had certain lands owned by him in what was then Los Angeles county, advertised for sale in the newspapers. Taylor saw the advertisement, and wrote to Toberman, saying he had some bonds and stock he would like to exchange for some of the land. That commenced the negotiations between them, which culminated, in the course

of a month or so, in the purchase by Toberman of the 50 bonds from Taylor at 90 cents on the dollar, which Toberman paid by conveying to Taylor real estate of that value. Before making the purchase Toberman inquired of the vice president, attorney, and secretary of the corporation as to the validity of the bonds, and was informed by each of them that they were regularly issued and sold, and were valid; and the records of the corporation showed that they were authorized to be sold for $35,000; that Taylor was entered as the purchaser of them, and was credited with the sum of $35,000 in payment therefor. Whatever might be held in regard to these bonds if in the hands of Taylor, there is no ground for the claim of counsel that Toberman's purchase was not made in good faith and for value. The accounts subsequently rendered by Taylor to the corporation, as well as other circumstances connected with the case, would be factors in determining the *status* of the bonds in his hands; but I do not see that they affect Toberman. In my opinion, the corporation is estopped to deny their validity in the hands of the latter.

It is also now urged on behalf of the motor company that the bonds in question were not negotiable instruments, and therefore that any defense that could be made against them in the hands of the original holders can be made as against all subsequent holders. Each of the bonds in suit, after containing the promise to pay $1,000 on the 1st day of January, 1908 contains the following clause:

"Or at the option of the obligor, this bond may be fully paid and redeemed at any time after the 1st day of January, 1893, at the maturity of the semi-annual installment of interest. But, if this bond shall be redeemed before its full maturity as aforesaid, notice of such intended redemption shall be given the holder thereof, either personally or by written notice, sixty days prior to the time of such redemption, or by publication in a daily newspaper of general circulation, published in the city of San Francisco, for at least sixty days prior to the time of such redemption."

It is contended on the part of the corporation that this clause rendered the contract uncertain as to the time of its fulfillment, and uncertain as to the amount which should be paid on it. In support of the point, the court is referred to sections 3087–3089, 3093, Civil Code Cal., the first of which declares: "A negotiable instrument is a written promise or request for the payment of a certain sum of money to order or bearer, in conformity to the provisions of this article;" the second, that it must not contain any condition not certain of fulfillment; the third, that the person to whose order it is made payable must be ascertainable at the time the instrument is made; and the fourth, that such instrument "must not contain any other contract than such as is specified in this article," to wit, article 1, c. 1, tit. 15, pt. 4, div. 3, Civil Code Cal. But counsel making the point did not cite the intermediate section 3091 of the same Code, which reads as follows: "A negotiable instrument may be with or without date, and with or without designation of time or place of payment."

The clause in question only confers upon the obligor the privilege of paying the bond before the ultimate date fixed in it, and, considered in connection with the context, renders the instrument similar to a promis-

sory note payable on or before a certain designated date. Assuming that, in the determination of this question, this court must be governed by the law of California, there is no difficulty in the way of holding such instruments negotiable. The case of *Adams* v. *Seaman*, 82 Cal. 636, 23 Pac. Rep. 53, is not in point. The promissory note that was there held nonnegotiable contained a "condition not certain of fulfillment," namely, a promise to pay an attorney's fee in the event a suit should be brought, and upon the further condition of the employment of an attorney; both of which conditions the court held were uncertain of fulfillment.

In support of the position that the bonds in question were not negotiable, there are also cited cases in which it was held that a provision reserving to the payee of a note the right to extend the time of payment indefinitely renders such notes nonnegotiable. But, clearly, such cases are not applicable to a case like the present, where the ultimate time of payment named in the bond must certainly come. As already observed, the clause in question, considered in connection with the context, renders the instrument similar to a promissory note, made payable on or before a certain designated day. The supreme court of Massachusetts held in several cases such a note nonnegotiable, but in the later case of *Union Cattle Co.* v. *International Trust Co.*, 149 Mass. 492, 21 N. E. Rep. 962, certain bonds there in question were held negotiable which were in terms made subject to the conditions of an agreement between the cattle company and the trust company, whereby it was "provided that a sinking fund of not less than $50,000 nor more than $100,000 in each year shall be applied to the purchase or drawing at par of said bonds, and that the whole issue may be drawn at par on November 1, 1891, or any coupon day thereafter." The court said:

"We think that these bonds are negotiable by virtue of Pub. St. c. 77, § 4, as well as by custom, notwithstanding the condition referred to in them, and that they appear to be bonds which were intended to be bought and sold in the market."

In *Riker* v. *Manufacturing Co.*, 14 R. I. 402, it was contended that the reservation in a promissory note of a right to pay the note before maturity, in installments of not less than 5 per cent. of the principal thereof, at any time the semiannual interest becomes payable, renders the note nonnegotiable for two reasons, namely: (1) Because the time of payment is uncertain; and (2) because the amount to be paid is uncertain. But the court held against the position, saying that if the time named in the note must certainly come, although the precise day may not be specified therein, it is sufficiently certain as to time, and that the maxim, *id certum est quod certum reddi potest*, applied. In *Bank* v. *Skeen*, 14 S. W. Rep. 732, the supreme court of Missouri, in respect to a note made payable on or before a certain named day, said that, having in view the reasons on which the negotiability of instruments are founded—

"It would seem obvious that a certainty of ultimate payment promised should not be considered impaired by the intervention of an option, in favor of the maker, to discharge his obligation at an earlier time. The paper still retains a fixed date when the promise to pay must be performed. It is no

more uncertain for practical purposes than a bill drawn, for example, 'at sight,' or 'on demand,' neither of which phrases has ever been held to diminish negotiability."

In *Mattison* v. *Marks*, 31 Mich. 421, in regard to a similar note, Judge COOLEY, speaking for the court, said:

"The legal rights of the holder are clear and certain. The note is due at the time fixed, and is not due before. True, the maker may pay sooner if he shall choose, but the exercise of this option would be a payment in advance of the legal liability to pay, and nothing more. Notes like this are common in commercial transactions, and we are not aware that their negotiable quality is ever questioned in business dealings."

The latter observation is equally applicable to the bonds in question in the present case, and I think it would be a surprise to the business community, as well as to the profession, if they should be held non-negotiable.

It is further contended that all of the bonds in question are absolutely void, because issued without the consent of the persons holding the larger amount in stock of the corporation, given at a meeting called for that purpose, of which 60 days' public notice was given; and this by reason of section 11, art. 12, of the constitution of California, which is as follows:

"No corporation shall issue stock or bonds except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void. The stock and bonded indebtedness of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock, at a meeting called for that purpose, giving sixty days' public notice, as may be provided by law."

It will be observed that the inhibition of the last clause of the foregoing provision is against the "increase" of the stock and bonded indebtedness of corporations. It is said that this includes the first issue of bonds. If so, it also includes the first issue of stock. If such was the intention of the framers of the constitution, it was not expressed. To give the provision the meaning contended for would, in effect, be to inject into it the word "create," which cannot be done. The courts have no more power to add to than they have to take from the provisions of the constitution. The case of *Ewing* v. *Mining Co.*, 56 Cal. 649, cited by counsel in support of their position, does not at all support it. There the attempt was made to increase the capital stock of the corporation in contravention of the provision of the constitution referred to. Nor did the state statute existing at the time of the issuance of the bonds in question require any notice to be given of the intention to create such bonded indebtedness.

The defendant First National Bank of San Bernardino asserts a prior lien to that of complainant upon the engines and other rolling stock of the motor road company, by reason of certain attachments, which, prior to the commencement of this suit, were duly levied upon such rolling stock in actions brought against the motor company on various promissory notes, and in which actions judgments were subsequently

rendered for the bank. In California it is provided by statute that chattel mortgages may be made upon, among other things, "locomotives, engines, and other stock of a railroad." Civil Code, § 2955. The next section prescribes the form of such mortgages; and by section 2957 it is provided that—

"A mortgage of personal property is void, as against creditors of the mortgagor and subsequent purchasers and incumbrancers of the property in good faith and for value, unless (1) it is accompanied by the affidavit of all the parties thereto that it is made in good faith, and without any design to hinder, delay, or defraud creditors; (2) it is acknowledged or proved, certified and recorded, in like manner as grants of real estate."

The complainant's mortgage was not accompanied by any affidavit, for which reason it is claimed to be void as against the attaching creditor of the motor company, in so far as concerns the rolling stock. In regard to the nature of the rolling stock of a railroad, the cases, where there are no legislative provisions on the subject, are very conflicting. Many of them will be found referred to in Jones on Railroad Securities, commencing at section 154. In concluding his observations upon them, that author says:

"While there are many and strong arguments for holding that rolling stock is a part of the realty,—and this view seems to have the support of the United States courts,—the weight of authority in the state courts seems to be against that position. There is, however, no hope that any uniform rule upon the subject will soon be arrived at by the courts without the aid of legislative enactment. It is of the highest importance that the validity of mortgages intended to embrace the rolling stock and other personal property of a railroad should not be left to the uncertain decision of the courts; for, in the present state of the law, it must, at least, be regarded as uncertain how the question would be determined by any court, not bound by precedent or a statute." Id. § 170.

In California, as has been seen, the statute defines what property shall be subject to a chattel mortgage, and includes "locomotives, engines, and other rolling stock of a railroad." And it declares that a mortgage upon such property is void as against creditors of the mortgagor and subsequent purchasers and incumbrancers of the property in good faith and for value, unless it is accompanied by the required affidavit and recorded in the prescribed way. The power of the legislature to regulate the mode by which property situated within the state shall be incumbered and conveyed cannot be doubted. The attachment liens of the defendant bank must therefore be held superior to complainant's mortgage. The judgment lien of the defendant Mary A. Franklin was subsequent, and therefore subordinate, to the mortgage. A decree of foreclosure and sale will be entered in accordance with the views above expressed.