### BROWN v. DULUTH, M. & N. RY. CO. et al.

(Circuit Court, D. Minnesota. February 18, 1893.)

1. RAILROAD COMPANIES—OVERCAPITALIZATION—CONSTRUCTION CONTRACT.
    Laws Minn. 1887, c. 12, § 1, prohibiting any railroad company or officer thereof from selling or disposing of shares of its capital stock, or issuing certificates therefor, unless such shares shall have been fully paid, or issuing any stock or bonds, except for money, labor, or property received and applied for the purpose for which the corporation was created, does not forbid the issue of first mortgage bonds and full-paid stock by a railroad company in payment for the construction of its road, if the amount issued does not unreasonably exceed the value actually received.

2. SAME—FRAUDULENT ISSUE OF STOCK—RIGHTS OF PURCHASER
    The assignment of railroad stock issued in pursuance of a fraudulent scheme, to which the assignor was a party, places the assignee in no better

position than his assignor was, and equity will not aid such assignee seeking relief by injunction as to acts of the directors and others in relation to other stock of the same issue, and which he asks to have canceled.

**8.** CORPORATIONS—STOCKHOLDERS.

An assignee of railroad stock, who has not registered his stock, nor obtained recognition as a stockholder, cannot bring suit in behalf of himself and other stockholders to restrain the action of the officers of the corporation from acts alleged to be ultra vires and illegal.

In Equity. Bill by William S. Brown against the Duluth, Missabe & Northern Railway Company and others to enforce corporate rights and restrain the corporation from acts alleged to be ultra vires. Injunction denied, and restraining order dissolved.

Lusk, Bunn & Hadley and John C. Spooner, for complainant.
H. G. Stone and J. M. Shaw, for defendants.

NELSON, District Judge. The original bill was filed January 23, 1893, and a restraining order was granted, and an order to show cause why a preliminary injunction should not issue. On the return day of the order, February 10, 1893, an amended bill was filed. The purpose of the original and amended bill is to enforce corporate rights, and to restrain the corporation from ultra vires acts, and the specific relief asked is for an accounting, and for a decree restraining the directors, and each of them, and the said other defendants, from voting upon and exercising the rights of stockholders by virtue of certain stock alleged to have been illegally secured by the directors, and directing the said defendants, or such of them as hold said stock, to surrender up the same for cancellation; and that a proposed issue of stock by the corporation, alleged to be a bonus, may be restrained, and that a proposed issue of bonds under a contract attached as Exhibit C to the amended bill, or under any modification of the same, or under any issue or sale of bonds for the purpose alleged to be of putting out corporate stock without receiving par value for the same be restrained, and that the defendants, directors, and officers and other defendants, naming them, may be restrained from contracting to issue, sell, or give away the stock now held or owned by them.

The complainant claims to be a stockholder of the defendant corporation, the Duluth, Missabe & Northern Railway Company, and brings the suit on behalf of himself and other stockholders of the corporation. At the hearing a motion to dismiss for want of jurisdiction was made, and a demurrer ore tenus interposed. It is urged that there is no equity in the original or amended bill, and that the complainant has no right to institute this suit. The defendant company was incorporated under the general laws of the state of Minnesota, May 26, 1891, to construct a railroad commencing at a point on the navigable waters of Lake Superior, or St. Louis bay, or St. Louis river, or at a point on some railroad connecting with the said waters, running thence in a northerly direction to some point on the northern boundary line of the state of Minnesota. On January 29, 1892, the company entered into a contract with Donald Grant to build and construct a portion of its line of railroad. By the terms of this construction contract the company was to place in the hands

of a trustee bonds and stock as follows: Nine hundred thousand dollars, face value, of its first mortgage bonds, guarantied by the Mountain Iron Company, a mining company located on the defendant company's road, and a party of the third part to this construction contract; also $945,000, face value, of its full-paid common stock; and the party of the third part agreed to put in the hands of the trustee $200.000, face value, of its full-paid common stock; and the Biwabick Mining Company, party of the fourth part to this contract, agreed to put up also $200,000, face value, of its full-paid common stock; and when Donald Grant completed the road all the stock and securities should be delivered to him. On the same day, Foley Bros. & Guthrie, a firm of railroad contractors, D. W. Grant, and Albert S. Chase, a brother of the president of the defendant railroad company, joined with Donald Grant in a copartnership, and assumed the performance of his construction contract, and agreed to build the road for the $900,000 bonds and $333,333 stock, and all the stock to be put up by the two mining companies. By the terms of the copartnership the parties thereto agreed to furnish money for the construction of the road as follows: Each of the parties thereto, except Albert S. Chase, one fifth, and the said Chase two fifths, and the securities received for the construction were to be divided between the parties in the same proportion. A further contract was made with Donald Grant for the construction of a branch line of the company's road, and assumed by the copartnership on the same terms. The compensation for building it was $300,000 in bonds and $300,000 in stock. The contracts were completed, and the securities turned over, in the autumn of 1892, and Foley Bros. & Guthrie received for their interest in the partnership construction contracts $240,000 in bonds and $126,666 of common stock of the railway company.

This common stock the complainant purchased January 12, 1893, for the sum of $9,720 in good faith, as he claims. It is alleged that the Duluth, Missabe & Northern Railway Company and Donald Grant and Albert S. Chase and all of the directors of said railway company conspired and confederated together by means of the said construction contract to issue a large amount of stock of said corporation as fully paid up, without receiving in fact any consideration for the same, and that it was well known that the construction of the road would not cost to exceed $580,000, and that, in pursuance of the conspiracy, A. S. Chase represented his brother and others directors of the company in the partnership contract with Donald Grant and others, and by means of the partnership contract and the original contract with Grant a scheme was devised to evade a statute of the state of Minnesota, (chapter 12, enacted in 1887,) and that by this scheme the amount of $611,667 of the common stock of the railway company, apparently a profit to Donald Grant on his construction contract, was intended to be and actually was divided between the directors of said corporation. The first section of this statute enacts as follows:

"Section 1. That it shall not be lawful for any railroad company existing by virtue of any laws of this state, nor for any officer of any such company, to sell, dispose of, or pledge any shares of the capital stock of such company,

nor to issue certificates of shares in the capital stock of such company, until the shares so sold, disposed of, or pledged, and the shares for which such certificates are to be issued, shall have been fully paid; nor issue any stock or bonds except for money, labor, or property actually received and applied for the purpose for which said corporation was created; and all fictitious stock, dividends, and other fictitious increase of the capital stock or indebtedness of any such corporation shall be void; and if any officer or officers of any such company shall issue, sell, pledge, or dispose of any share or certificates of shares of the capital stock of such company in violation of the provisions of this act, such officer or officers so doing shall be deemed guilty of a misdemeanor, and, upon a conviction thereof, shall be punished as hereinafter provided. The provisions of this act shall apply as fully to the stock of consolidated railroad companies existing in whole or in part within this state as to original consolidated companies existing as aforesaid."

This statute was enacted to prevent "watered stock," so called, from being issued and imposed upon the market. Whether the scheme for building this road set forth in the construction contract and the partnership contract was intended to enrich the directors, and enable them to receive a profit in stock without any consideration therefor, it is not necessary to determine. If a suit can be maintained by a stockholder to avoid the disaster to the corporation and the public of such a contract and such an alleged scheme, the complainant is under no circumstances in a situation to bring it. Foley Bros. & Guthrie, the assignors of the complainant, from whom he purchased his stock, was a member of the copartnership of Donald Grant and others, and in the articles of copartnership the construction contract of Grant with the company is recited, and Foley Bros. & Guthrie knew that $945,000 of common stock at one time and $300,000 at another of the railroad company were required to be placed in the hands of the trustee to be delivered to Grant on the completion of the construction contracts. They received their stock out of these blocks of stock, and it is a part of this stock which it is claimed by the complainant is fraudulently and illegally issued and held by the directors and other defendants, and which he seeks to have canceled. Foley Bros. & Guthrie participated in the benefits of this alleged fraudulent scheme, and they would not be permitted to complain of it. The complainant, as their transferee, is in no better situation than they are. He has no greater rights than his transferrers, as regards a remedy invalidating the transaction. The maxim "in pari delicto" applies, and a court of equity will not aid him. He cannot bring suit in behalf of other stockholders against the corporation or other parties participating in the issue, as his own title is tainted with the same fraud.

Again, a part of the relief sought is to restrain a proposed issue of stock by the corporation, alleged to be a bonus, and a proposed issue of bonds under a contract annexed as Exhibit C to the amended bill, or any modification of it, or the issue or sale of bonds for the purpose of putting out corporate stock without receiving par value for the same; and that the directors and holders of the stock tainted with the alleged fraudulent scheme under the construction and partnership contracts be restrained from selling it. It is urged by counsel to sustain the motion for an injunction on this branch of the case that the complainant, though his assignors may

have sold to him stock which is a part of a fraudulent issue, and of which they had notice, yet, as a stockholder, he can enforce corporate rights to prevent threatened illegal acts in the future, and by his amended bill he seeks to prevent the corporation and its directors and officers from carrying out the terms of a contract which are in violation of the statute above recited, and therefore contrary to public policy, and are also disadvantageous and injurious to the corporation and stockholders. The contention on the part of the defendants is that the contract referred to is a real bona fide transaction for the purpose of constructing the entire railroad contemplated by its charter, and to carry out legitimate corporate purposes. The contract complained of is attached to the amended bill of complaint, and is too long to embody in this opinion. Briefly it provides for the sale of $2,000,000 of a new issue of first mortgage bonds at 80 per cent. of their par value, and a delivery to the purchasers simultaneously and pro rata with the delivery of the bonds an amount of the capital stock of the railway company equal to 33⅓ per cent. of the par value of the bonds purchased; that is, $666,666.66 par value of stock. In substance, the company is to receive $1,600,000 cash for $2,000,000 face value of bonds and $666,666.66 face value of common stock. The bonds and stock are to be delivered as the installments of cash are received, and the entire amount is to be expended in building the road and for legitimate corporate purposes. The contract provides in detail for the expenditure of the money received by the company, and furnishes approximate estimates of the cost of structures and rolling stock and ore docks necessary to equip the road, and enable it to successfully engage in the business contemplated by its organization.

The questions presented in the argument on this branch of the case are: (1) Is such a contract forbidden by the statute supra? (2) Can the complainant bring a stockholders' suit to prevent the corporation from carrying out the contract? This statute was not intended to prevent or interfere with the usual method of raising money to build railroads, or for any legitimate corporate purpose. It is not to be construed as obstructive to the extent of restricting and hampering corporations in their internal management, and embarrass them in procuring means to carry out the legitimate purposes of the corporation; and unless it appears that, under the guise of building its road, bonds and stock of the defendant company are to be issued and put upon the market fraudulently that do not and are not intended to represent money and property, this corporation is not prohibited from entering into a real transaction based upon a present consideration, and having reference to legitimate corporate purposes. Beach, Corp. p. 909, and authorities there cited. Such a transaction is not a scheme or device to evade the statute. It may be that an amount of corporate bonds and stock turned over by a corporation is so much in excess of the expenditures to be made by the recipients of the same that a court would hold that the statute prohibited such a transaction; but, if the purpose of the corporation in issuing bonds and stock is to build its road, and no unreasonable amount is issued beyond the value actually received or provided for, the statute, in my opin-

ion, does not apply. As said by the court in Railroad Co. v. Dow, 120 U. S. 298, 7 Sup. Ct. Rep. 482:

"The prohibition against the issue of the stock or bonds except for money or property actually received or labor done, and against fictitious increase of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs that was sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value."

And, further, the court recurring to the language employed in the Arkansas constitution, which is substantially like the Minnesota statute, declared that such a provision does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. I am of the opinion that this contract is not forbidden by the statute, and that the allegations of threatened wrong acts by directors are not sufficient, as stated in the amended bill, to make it illegal.

However, if it should be conceded that the contract is one which ought not to be sanctioned by a court of equity, the second question must be determined. I have considered the question involved as if the right of complainant to bring this stockholder's suit was clear. Has he, on the facts stated in the original or amended complaint, the right, as a stockholder, to institute this suit to restrain the corporation from alleged ultra vires and illegal acts? A membership in this corporation consists in the ownership of shares thereof recognized by the corporation. The complainant claims membership by acquiring corporate stock by transfer, but, not having registered his stock, and obtained recognition by the corporation as a stockholder, he can claim no other rights than those, which the assignment vests in him. Undoubtedly, as between himself and his assignors, the purchase of the certificate gives him all the rights of ownership, and entitles him to demand that he shall be registered by the corporation; but, until he has caused a transfer to be made upon the books of the corporation, his title, as between the corporation and himself, is not perfected, and he neither has the, rights nor is subject to the liabilities of membership. He may bring a suit, under some circumstances, to protect his individual, interests in the corporate property, but he cannot participate in the management of the corporation, and enforce corporate, rights to restrain threatened wrongs on the corporate interests. He brings this suit in behalf of himself and his associate stockholders. Not being a stockholder himself recognized by the corporation, he is personally precluded from doing this. In Heath v. Railway Co., 8 Blatchf. 347, 392, 410, it was held by the court that one Burt, who was not a stockholder, was improperly joined as a complainant. See, also, Ramsey v. Erie Ry. Co., 7 Abb. Pr. (N. S.) 156, and Hersey v. Veazie, 24 Me. 9. In view of this decision, the complainant here has no, standing in court to enforce the corporate rights alleged in the amended bill, and the motion for an injunction is denied, and the restraining order discharged. Let an order be entered to that effect.