ATLANTIC TRUST CO. v. WOODBRIDGE CANAL & IRRIGATION CO.
(BUELL et al., Interveners).

(Circuit Court, N. D. California. April 5, 1897.)

CORPORATIONS—PLEDGE OF BONDS.
    Const. Cal. art. 12, § 11, and Civ. Code, § 359, providing that "no corporation shall issue stocks or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void," do not prevent a corporation from pledging its bonds as collateral security for a debt less in amount than their par value. Such a pledge is an "issue" of the bonds, so as to make them valid corporate obligations.

This was a petition of intervention filed by P. A. Buell & Co., Louis Einstein & Co., Fresno National Bank, Stockton Lumber Company, Kutner Goldstein Company, Frances Cogswell, H. Bentley, Bank of Central California, and J. H. Swain in the suit of the Atlantic Trust Company against the Woodbridge Canal & Irrigation Company.

  John B. Hall and Scrivner & Schell, for complainant.
  Wood & Levinsky and Edward P. Cole, for interveners.

MORROW, District Judge. This case now comes up on the petition of intervention of P. A. Buell & Co. and the other interveners above referred to in the title to this cause. The interveners seek to have certain bonds (26 in number) of the defendant corporation allowed out of the proceeds to be derived from the sale in the foreclosure proceedings now pending in this suit. An answer has been filed by the complainant to the petition of intervention, and a stipulation of facts has been entered into between the complainant and the interveners. The facts relating to the issue of the bonds are, briefly, these: The stockholders of the Woodbridge Canal & Irrigation Company, the defendant corporation, by a resolution adopted on July 11, 1891, authorized the officers of the company to borrow the sum of $100,000, and to issue its bonds in said amount, and to execute its mortgage or deed of trust to secure the same. Pursuant to this authorization, the defendant company made and executed on or about July 17, 1891, 100 bonds, of the par value of $1,000 each, and numbered from 1 to 100, both numbers inclusive. To secure the payment of these bonds, the defendant company on July 17, 1891 (contemporaneously with the issue of the 100 bonds), executed and delivered to the complainant, the Atlantic Trust Company, as trustee, its indenture of mortgage, or deed of trust. The complainant, on its part, duly executed the said mortgage or deed of trust, and accepted and assumed the trusts created thereby. The deed of trust was duly recorded on August 10, 1891, in the recorder's office of the county of San Joaquin, state of California. By said deed of trust the Woodbridge Canal & Irrigation Company mortgaged to the complainant, as trustee, to secure the payment of the aforesaid issue of 100 bonds, its entire corporate property. The mortgage or deed of trust, after reciting the necessities and purposes for which the defendant company desired to borrow the sum of $100,-000, states:

"And whereas, the said company, to that end, is about to execute and to place in the hands of the said trustee, to be issued, certified, and delivered as shall be directed by resolution of the board of directors of said company, its one hundred corporate bonds, of one thousand dollars each, numbered consecutively from one to one hundred, both inclusive, with semiannual coupons or interest warrants attached, and with certificates to be signed by the said trustee, all of which bonds, coupons, and certificates are in the following form: * * *"

Here follow the forms of the bonds, coupons, and certificates, and a description of the entire corporate property covered by the mortgage, as follows:

"All its lands, tenements, hereditaments, privileges, franchises, rights of way, flowage and riparian rights, easements and fixtures, now owned or hereafter to be acquired; and all its canals, flumes, head works, gates, dams, bridges, etc., now constructed or to be hereafter constructed: * * * and all the estate, right, title, and interest, claims and demands, rights of way, and other easements, whether at law or in equity, of the said company, of, in, and to the same, and each and every part and parcel thereof; and also all buildings, fixtures, and personal property thereon, or belonging to said company: and all receipts, incomes, and profits which said company shall derive on account of any contract or agreement for the transfer of water rights, as appurtenant to specified lands, excepting and not including the annual rentals for the use of said water and interest on such contracts or agreements. To have and to hold the above-granted premises and property, with the appur-

tenances, unto the said trustee, its successors and assigns, in trust, and upon the trusts, uses, and purposes hereinafter expressed of and concerning the same, for the use and benefit of any and all persons or corporations who shall hereafter, at any time, become the purchasers, holders, or owners of any of said bonds, subject to the terms, provisions, and stipulations in said bonds contained, and also subject to the possession and management of said canal system and property by said company, its successors, assigns, or lessees, so long as no default shall be made in the payment of either interest or principal of said bonds, as herein provided, and so long as the said company shall well and truly observe, keep, and perform, all and singular, the covenants, agreements, conditions, and stipulations in said bonds and in this indenture contained and set forth, and which are to be observed, kept, and performed by and on the part of said company."

The seventh article of mortgage provides:

"Out of the moneys received from any tolls, income, rents, profits, and earnings of said canal and premises, or out of the proceeds of said sale so to be made as aforesaid, or the sinking fund above provided for, after fir ' deducting the expenses, disbursements, costs, charges, and counsel fees incurred in and about the conducting of said sale, or the working and operating said canal, including the compensation and commission of said trustees in and about the execution of this trust, and all expenses or repairs, replacements, alterations, additions, and improvements, and all payments for taxes, assessments, charges, or liens on said premises, or any part thereof, the trustee shall, if the amount be sufficient for that purpose, pay said mortgage bonds, or so many of them as shall be outstanding and unpaid, together with all interest then due upon the same; and, if the amount be insufficient, then it shall divide the same pro rata among the outstanding bonds, and the surplus of all such moneys or proceeds of sale, if any there be, shall be paid to the company, or its successors or assigns."

The bonds are entitled "1st Mortgage Convertible Gold Bonds of the Woodbridge Canal and Irrigation Company," and they recite, among other things, that:

"This bond is one of a series of one hundred bonds of similar amount, tenor, and date, which are secured by a mortgage or deed of trust, bearing date this day, executed and delivered by the Woodbridge Canal and Irrigation Company to the Atlantic Trust Company, as trustee, conveying and assigning to the said trustee all its corporate property and franchises now owned or hereafter acquired. Any lawful holder of this bond, upon presenting the same at the office of the said trustee, with all unmatured coupons attached thereto, may have the same registered, in his own name or that of any other person, in a book to be kept for that purpose; and such name, with the date of registry, shall be indorsed upon the bond by the said trustee. * * *"

The bonds further provide:

"This bond shall not become valid or obligatory until the certificate indorsed hereon shall have been duly signed by or in behalf of the said Atlantic Trust Company, as trustee."

The form of the certificate just referred to is as follows:

"The Atlantic Trust Company hereby certifies that the within bond is one of the bonds issued under and in pursuance of a certain mortgage or deed of trust, dated ——, and duly executed and delivered to said company, as trustee, by the Woodbridge Canal and Irrigation Company."

The petition of the interveners alleges, in paragraph 5:

"That each of said bonds, when so executed as aforesaid, bore indorsed thereon certificates in the manner and form as set forth in the plaintiff's said amended bill of complaint."

Article 2 of the stipulation of facts admits that this allegation is true. A further stipulation, entered into on March 29, 1897,

concedes that each one of the 26 bonds held by the interveners was duly certified to by the Atlantic Trust Company.   The regularity and validity of the entire issue of the bonds, including the 26 held by the interveners, is therefore conclusively established; and the complainant, as trustee, is estopped from denying or impeaching the validity of any of them.   Indeed, the presumption, in the absence of any evidence to the contrary, is in favor of the regularity of the issue.   As was well said by Woods, Circuit Judge, in Stanton v. Railroad Co., 2 Woods, 523, Fed. Cas. No. 13,297, in speaking of the duties of bondholders to take notice, and of the presumptions in favor of the regularity of bonds:

"The holders of the bonds were bound to take notice of what was contained in or indorsed upon their bonds. They were bound to take notice of what was contained in their deed of mortgage, and of the laws of the state referred to in the deed of mortgage. * * * By a reference to the bonds, they [the holders of the bonds] would have seen that the governor had indorsed them, and recited in his indorsement that he had done so in pursuance of law; they would have seen that the face of the bond recited that it was one of a series of numbered bonds, issued in accordance with the laws of the state above recited, secured by the indorsement of the governor, made in pursuance of the same laws, and was a first lien upon the railroad and other property of the railroad company; and they would have seen that the bonds bore the indorsement of the trustees named in the mortgage deed, to the effect that they were the bonds described in, and secured by, the said mortgage. * * * They had the right to presume that the governor had not violated his duty; that, before he indorsed the bonds, he had on file the oath of the president and chief engineer of the railroad company that a sufficient number of miles of railroad had been completed to authorize the indorsement."

It appears from the stipulation of facts that 67 of the 100 bonds, with the coupons attached, secured by the said mortgage when so executed, were by the said Woodbridge Canal & Irrigation Company duly issued, sold and delivered to purchasers thereof, prior to September 1, 1891, for money actually paid to it for the same, and one more of said bonds (numbered 74) was issued and negotiated by said irrigation company prior to the 1st day of September, 1894, for labor done and property actually received by the company, but that the rights of the holders of the 26 bonds held by the interveners to share in the protection of the lien of the mortgage is disputed by the complainant and the holders of the 67 bonds referred to.   Respecting the petition of intervention of P. A. Buell & Co., it appears that the notes held by them were for certain lumber furnished for the construction of ditches and flumes.   With reference to the bonds held by the other interveners, it is stipulated that they were—

"Issued and delivered by the defendant, the Woodbridge Canal & Irrigation Company, to the various pledgees therein described, for the amount mentioned therein, and under similar circumstances and like conditions as those pledged to P. A. Buell & Co., and that the various interveners therein described are the assignees of said bonds and obligations by assignment for value from the original pledgee, and that the said interveners took said bonds and said obligations of the said defendant, the Woodbridge Canal & Irrigation Company, with full knowledge that the said bonds had been pledged to secure the respective obligations so transferred, and no part of said bonds or obligations have been paid."

· The stipulation of facts further recites that the—

"Only consideration paid the said Woodbridge Canal & Irrigation Company for the issuing and delivering of said bonds was the consideration aforesaid, and said bonds were simply intended as a collateral security to secure the obligations of the said defendant, the Woodbridge Canal & Irrigation Company."

It further appears from the averments of the petition of intervention, which, in this respect, is made part of the stipulation of facts, that the defendant corporation, in pledging its bonds as collateral security for the payment of the promissory notes executed by it, in several instances executed and delivered bonds considerably in excess of the sum called for by the promissory notes; that is, taking the bonds at their par value of $1,000 each. The mere fact, however, that in the instances referred to the bonds were issued for more than the value of the notes they secured, does not, of itself, indicate fraud, or create a fictitious indebtedness. Railway Co. v. Dow, 120 U. S. 287, 299, 7 Sup. Ct. 482; Brown v. Railway Co., 53 Fed. 889; Nelson v. Hubbard (Ala.) 11 South. 428. It is well settled that a corporation can sell its stock or bonds at less than par. Union Loan & Trust Co. v. Southern California M. R. Co., 51 Fed. 845, 846; Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476; Handley v. Stutz, 139 U. S. 430, 11 Sup. Ct. 530; Stein v. Howard, 65 Cal. 616, 4 Pac. 662; Underhill v. Improvement Co., 93 Cal. 310, 28 Pac. 1049; Railway Co. v. Worthington (Tex. Sup.) 30 S. W. 1055; Gamble v. Water Co., 123 N. Y. 107, 25 N. E. 201; Shannon v. Stevenson (Pa. Sup.) 34 Atl. 218. There is no law in the state of California, such as there is in the state of Wisconsin, fixing the limit at which stocks or bonds can be hypothecated below par for money, labor, or property actually received. In Wisconsin (Rev. St. § 1753) a statute restrains any corporation from hypothecating its bonds as a security for loans without stipulating that they shall be accounted for at not less than 75 cents on the dollar of their par value, and all bonds otherwise issued are void. Pfister v. Railroad Co., 83 Wis. 86, 53 N. W. 27; 5 Thomp. Corp. p. 4707, § 6059. Moreover, the stipulation of facts raises no question of fraud or want of consideration as to any of the 26 bonds now held by the interveners. Section 11 of article 12 of the constitution of the state of California provides:

"No corporation shall issue stocks or bonds except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void." Pol. Code, p. 60 (Deering's Ann. Codes & St. Cal).

Section 359 of the Civil Code is identical with the above constitutional provision. There are three distinct purposes for which bonds can be issued by a corporation: (1) Money paid; (2) labor done; and (3) property actually received. Under the facts as stipulated, the pledge of the bonds, if it be valid, must come within the third division, viz. property actually received. It will be observed that neither the constitutional provision nor the Code enactment says anything about the "sale" or "pledge" of stocks or bonds. They simply use the word "issue."

The complainant contends (1) that the defendant corporation had no right to issue and pledge its bonds as security for its indebtedness;

and (2) that the delivery of said bonds, under the conditions set forth in the stipulation of facts, was not an issuance of the same, as required by law. Both of these contested points may be merged into the one inquiry, viz. as to the validity of the issue of the 26 bonds as collateral security. The general power of private corporations to sell or pledge their bonds is well settled. 5 Thomp. Corp. § 6061; 1 Mor. Corp. § 349; Railway Co. v. Dow, 120 U. S. 298, 7 Sup. Ct. 482; Trust Co. v. Weed, 2 Fed. 24; Union Loan & Trust Co. v. Southern California M. R. Co., 51 Fed. 845, 846; Lehman v. Manufacturing Co., 64 Ala. 567; Duncomb v. Railroad Co., 84 N. Y. 190; Nelson v. Hubbard, 96 Ala. 238, 11 South. 428, 433. The expression "issue," in the constitution and Code, is certainly broad enough to cover a pledge as well as a sale of bonds. In the contemplation of law, bonds pledged by a corporation are just as much issued as when they are sold. The provision in the constitution and Code referred to was not intended to impair or interfere with the right of corporations to issue their bonds and utilize them according to the usual and ordinary business methods prevalent in the commercial world. The purpose and scope of constitutional provisions like the one involved in this case were well explained by the supreme court of the United States in Railway Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482. The court in that case were considering the eighth section of the twelfth article of the constitution of Arkansas, which is substantially the same as section 11 of article 12 of the constitution of California. Mr. Justice Harlan, after stating the facts, which are analogous to those of the case at bar, said:

"The prohibition against the issuing of stock or bonds except for money or property actually received or labor done, and against the fictitious increase of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value."

After referring to a provision in the constitution of Illinois which contains a prohibition similar to that imposed by the Arkansas constitution, and citing the case of Railway Co. v. Thompson, 103 Ill. 187, 201, enunciating similar views, the learned justice proceeds:

"Recurring to the language employed in the Arkansas constitution, we are of opinion that it does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. It is not clear, from the words used, that the framers of that instrument intended to restrict private corporations—at least, when acting with the approval of their stockholders—in the exchange of their stock or bonds for money, property, or labor, upon such terms as they deem proper; provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law and accomplish that which is forbidden. We cannot suppose that the scheme whereby the appellant acquired the property, rights, and privileges in question for a given amount of its stocks and bonds falls within the prohibition of the state constitution. The beneficial owners of such interests had the right to fix the terms upon which they would surrender those interests to the corporation of which they were to be the sole stockholders."

See, also, Brown v. Railway Co., 53 Fed. 889; Nelson v. Hubbard, 96 Ala. 238, 11 South. 428, 432.

Counsel for complainant rely greatly on the case of Farmers' Loan & Trust Co. v. San Diego St. Car Co., 45 Fed. 518, where it was held by Judge Ross that a pledge of bonds as collateral security for a pre-existing indebtedness was contrary to the constitutional provision referred to, and therefore void. The bonds held by these interveners were not issued for pre-existing indebtednesses, so far as the stipulation of facts discloses. The cases must therefore be distinguished on that ground. Furthermore, it appeared in the case cited that the issue of bonds was for a purpose other than that to which it was devoted; and it was held to be a pledge without authority, and in fraud of the rights of the stockholders. It is to be observed that the same learned judge, in Union Loan & Trust Co. v. Southern California M. R. Co., supra, recognized and sustained the validity of certain bonds which had been pledged as collateral security.

I am of the opinion, upon the whole of the issues framed by the complainant and the interveners on this petition, that the 26 bonds held by the interveners were duly and legally issued, and are valid, under the constitutional provision referred to, and, furthermore, that the defendant corporation had the right to, and did, pledge them as collateral security. They are therefore entitled, with the 67 first mortgage bonds admitted to have been properly and regularly issued by the defendant corporation, to share in the proceeds to be derived from the foreclosure sale, after satisfying costs and such preferential claims as there may be. If, however, such proceeds of sale are insufficient to pay in full both the bonds held by the complainant and the interveners, they shall be satisfied pro rata. See, in this connection, article 7 of the mortgage or deed of trust; Stanton v. Railroad Co., 2 Woods, 523, Fed. Cas. No. 13,297; Ketchum v. Duncan, 96 U. S. 671; Pennock v. Coe, 23 How. 130; In re Regent's Canal Iron-Works Co., 3 Ch. Div. 43; Hodge's Appeal, 84 Pa. St. 359. Judgment will be entered in accordance with this opinion.